**PUBLISH**

**UNITED STATES COURT OF APPEALS**

Filed 8/27/96

**TENTH CIRCUIT**

---

PATRICIA YORK,

      Plaintiff - Appellant,

    v.

AMERICAN TELEPHONE &
TELEGRAPH CO.;
INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS,
LOCAL UNION NO. 2021; ROBERT
LEE,

      Defendants - Appellees.

No. 95-6068

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D. Ct. No. CIV-94-177-R)**

---

Joseph R. Weeks, Oklahoma City University School of Law, Oklahoma City, Oklahoma (Marilyn D. Barringer, Oklahoma City, Oklahoma, with him on the briefs) appearing for the Appellant.

Debra B. Cannon, McKinney, Stringer & Webster, Oklahoma City, Oklahoma (Jim T. Priest, McKinney, Stringer & Webster, Oklahoma City, Oklahoma, and Marc E. Manly, Law Vice President and Solicitor General, AT&T Corp., Basking Ridge, New Jersey, with her on the brief) appearing for Appellee AT&T.

Loren F. Gibson (George J. McCaffrey with her on the brief), Lampkin, McCaffrey & Tawwater, Oklahoma City, Oklahoma appearing for Appellee IBEW Local 2021.

Before SEYMOUR, Chief Judge, TACHA, and EBEL, Circuit Judges.

TACHA, Circuit Judge.

Patricia York sued the American Telephone and Telegraph Company ("AT&T"), the International Brotherhood of Electrical Workers, Local Union No. 2021 ("IBEW"), and Robert Lee under Title VII, alleging sex-based disparate treatment and disparate impact discrimination. A jury found for the defendants, and the district court denied York's motion for a new trial. York now appeals the district court's (1) refusal to give particular jury instructions, (2) grant of summary judgment to IBEW on her disparate treatment claim, (3) rulings on her motions in limine, (4) refusal to take judicial notice of the disparate impact of AT&T's two-year experience requirement for the position in question, (5) refusal to grant a new trial, and (6) grant of summary judgment in favor of the defendants on her public policy claim. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## I. Background

In July 1992, AT&T posted an advertisement for the position of Group I Operating Engineer in the powerhouse of the AT&T plant in Oklahoma City,

Oklahoma. The position involved the operation and maintenance of a variety of powerhouse machinery, including steam turbines, boilers, chillers, and compressed air systems, as well as the monitoring of a control panel to prevent an explosion from occurring in the boilers and steam-driven machinery. The position entailed considerable responsibility for the safety of property and other workers.

AT&T's collective bargaining agreement with IBEW required AT&T to fill vacancies in the Operating Engineer position through the use of a bid procedure, by which interested employees submitted bids, or applications, for the job. The agreement obliged AT&T to accept the bid of the most senior applicant meeting the job qualifications described in the agreement. The job qualifications for the Operating Engineer position, as replicated in the advertisement for the position, were:

> (1) Completion of an accredited trades training course or equivalent knowledge and skill acquired by means of practical experience.

> (2) Demonstrated ability of basic skills associated with this trade.

In 1989, three years prior to applying for the advertised Operating Engineer position, York asked Joe Srejma, the powerhouse supervisor at the time, how she could "get in the boilerhouse." He stated that she would have to complete a vocational training course and obtain a Class I license for boiler operation. Although he did not specifically mention the requirement of prior practical experience, at the time of their conversation two years of experience was a

prerequisite for obtaining a Class I license in Oklahoma City.

Initially, AT&T only advertised the job opening within the Oklahoma City facility. York and seven other employees submitted bids for the position. York was the only woman among the eight applicants. Robert Lee, the first line supervisor over the Operating Engineers, interviewed the applicants and determined that none of them possessed the stipulated minimum qualifications for the position. York, who had worked for approximately twenty-three years in the Maintenance Department at the Oklahoma City plant, was the most senior applicant. She had also completed two vocational courses on low- and high-pressure boilers and had received a Class I license for boiler operation from the City of Oklahoma City. However, by the time she received her Class I license two years experience was no longer a requirement. Consequently, she possessed no practical experience in the area and thus failed to meet the job qualification of "skill acquired by means of practical experience." AT&T's longstanding hiring practice had been to require Operating Engineer candidates to possess two years of experience in order to satisfy this requirement.

After Lee determined that there were no qualified candidates within the Oklahoma City facility, AT&T human resources personnel placed the job advertisement on AT&T's Automated Transfer System ("ATS"), a computer system that advertises positions nationally within AT&T. Two AT&T employees

from outside Oklahoma City submitted bids on the ATS. One of these applicants, R.D. Matthews, had nine years of previous experience as an Operating Engineer at another AT&T facility and met all of the posted qualifications. AT&T ultimately selected him for the position.

Prior to the hiring of Matthews, Lee informed York that the experience requirement was absolute and that she did not meet the posted qualifications for the position. York then asked her IBEW representatives to file a grievance on her behalf protesting the determination that she was not qualified. The union representatives refused to do so, agreeing with AT&T's view that the collective bargaining agreement required Operating Engineers to possess practical experience. At that point, York asked her union representatives to speak with company management on her behalf to induce them to discontinue the search for an Operating Engineer and instead create a powerhouse trainee position. York would then apply for that position. Testimony offered at trial conflicts as to whether IBEW representatives ever made such a request on York's behalf. In any event, IBEW declined to file a grievance against AT&T or officially contest the company's decision on this issue. York also made her request directly to Lee. Lee refused to stop the search for an Operating Engineer and create a trainee position because he believed that the collective bargaining agreement required AT&T to first readvertise the Operating Engineer position on the ATS. York then

brought this suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq, alleging sex-based disparate treatment and disparate impact discrimination in AT&T's hiring practices. After a four-day trial, the jury returned a verdict in favor of the defendants on all claims.

York maintains that she understood the first qualification in the advertisement for the Operating Engineer position to state two alternative, rather than mandatory, requirements. The qualification reads: "Completion of an accredited trades training course or equivalent knowledge and skill acquired by means of practical experience." York interpreted this language with emphasis on the word "or" as the division point between the two alternatives. That is, she believed that either (1) the completion of an accredited training course or (2) equivalent knowledge and skill acquired by means of practical experience would have satisfied the qualification. However, the drafters of the agreement, AT&T and IBEW, intended the emphasis to fall on the word "and." Understood this way, the qualification contained two requirements, both of which had to be satisfied: (1) completion of a training course or equivalent knowledge and (2) practical experience.

## II. The Jury Instructions

We review a district court's refusal to give a requested jury instruction for

abuse of discretion. United States v. Lee, 54 F.3d 1534, 1536 (10th Cir.), cert. denied, 116 S. Ct. 247 (1995). However, we review de novo the question of whether the court's instructions, considered as a whole, properly state the applicable law and focus the jury on the relevant inquiry. Id. York challenges the instructions offered by the court on four grounds. First, she contends that the court erred by only presenting the fact-finding framework for assessing indirect evidence of discrimination laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981), and not also instructing the jury that a plaintiff may alternatively show that sexually discriminatory reasons motivated an employer by presenting direct evidence of discrimination. See Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121-22 (1985); Long v. Laramie County Community College Dist., 840 F.2d 743, 748-49 (10th Cir.), cert. denied, 488 U.S. 825 (1988). York did not raise this objection at trial. In the absence of a proper objection, we review a district court's instructions for plain error. Palmer v. Krueger, 897 F.2d 1529, 1532-33 (10th Cir. 1990).

York maintains that she submitted direct evidence of discrimination in the form of testimony from two witnesses, Patricia Giddens and Mark Sloan. Giddens testified that prior to the posting of the Operating Engineer advertisement, she asked Lee whether he was going to hire York for a position in

the powerhouse. Lee answered, "No, I'm not," and then explained that there was not an opening at that time and that York did not yet possess a Class I license. Sloan testified that, in a conversation with Lee that occurred after York had already been informed that she was not qualified for the position, he stated to Lee, "I heard you're going to be having a female employee." Lee responded that "there wasn't going to be the woman he was asking . . . about." In both instances, Lee's response was ambiguous and may have reflected entirely nondiscriminatory hiring practices. This evidence does not rise to the level of direct evidence of discrimination needed to set aside the McDonnell Douglas mode of inquiry. Indeed, where the Supreme Court has been willing to regard the McDonnell Douglas test as inapplicable, the employer's policy has been "discriminatory on its face," treating the members of the disadvantaged group differently according to the very terms of their employment. Trans World Airlines, 469 U.S. at 121. The district court was therefore correct in directing the jury to apply the McDonnell Douglas test. See Furr v. AT & T Technologies, 824 F.2d 1537, 1549 (10th Cir. 1987) (describing when the McDonnell Douglas test is inapplicable).

York's second challenge concerns the district court's refusal to submit her instruction concerning the term "qualified" in the McDonnell Douglas test. Under the McDonnell Douglas test, the plaintiff in an employment discrimination case bears the initial burden of establishing a prima facie case, which may be

accomplished by showing:

> (i) that he belongs to a racial minority [or other class protected under Title VII]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

McDonnell Douglas, 411 U.S. at 802 (emphasis added). If the plaintiff succeeds in establishing a prima facie case, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Id. Finally, if the employer succeeds in presenting a nondiscriminatory reason, the burden returns to the plaintiff to show that the offered reason is merely a pretext by demonstrating either that a discriminatory reason more likely motivated the employer or that the employer's explanation is unworthy of credence. Burdine, 450 U.S. at 256.

York's challenges the district court's instruction regarding the components of a prima facie case. The court stated that the plaintiff must prove, among other things, "[t]hat Plaintiff was qualified for the position of Operating Engineer." York asked that the jury be instructed that to be "qualified," the plaintiff need only show that she possessed the minimal qualifications that the jury deemed necessary for safe and effective job performance. In effect, York's requested instructions would have directed the jury to determine the appropriate qualifications for the job rather than accept the employer's stated qualifications.

York's requested instruction misconstrues the first stage of the McDonnell Douglas test. It is not the fact finder's task to assess which of an employer's stipulated qualifications ought to be required of applicants for a particular position. "Employers are given wide discretion in setting job standards and requirements and in deciding whether applicants meet those standards." Hickman v. Flood & Peterson Ins., Inc., 766 F.2d 422, 425 (10th Cir. 1985). As long as the qualifications offered by the employer are reasonable and have been consistently applied to all applicants for the position, as was the case here, there is no reason for the fact finder to supplant the employer's list of qualifications with its own. The district court did not abuse its discretion in rejecting York's requested instruction.

York's third challenge to the jury instructions concerns the court's refusal to instruct the jury that it was free to draw a negative inference where a party fails to produce evidence that is under that party's control. We review this decision for abuse of discretion. See Wilson v. Merrell Dow Pharmaceuticals, Inc., 893 F.2d 1149, 1150 (10th Cir. 1990). York proposed a standard missing witness instruction: "If a party fails to produce evidence which is under his control and reasonably available to him and not reasonably available to the adverse party, then you may infer that the evidence is unfavorable to the party who could have produced it and did not." York requested this instruction with regard to her

contention that the collective bargaining agreement language governing the qualifications for the Operating Engineer position was ambiguous and could have meant that the practical experience requirement was an alternative to, not an additional requirement to, the vocational training requirement. She maintains that AT&T could have presented testimony from officials at AT&T plants in locations other than Oklahoma City explaining their interpretation of the same collective bargaining agreement language.

Four factors must be present before a jury may be instructed to draw a negative inference from a party's failure to call a particular witness:

> (1) the party must have the power to produce the witness; (2) the witness must not be one who would ordinarily be expected to be biased against the party; (3) the witness's testimony must not be "comparatively unimportant, or cumulative, or inferior to what is already utilized" in the trial; and (4) the witness must not be equally available to testify for either side.

Id. at 1150-51 (citations omitted). The party requesting a missing witness instruction bears the burden of demonstrating that these criteria are satisfied. Id. at 1151. These four factors apply regardless of whether the requested instruction directs the jury to draw a negative inference or merely permits the jury to draw a negative inference. York never demonstrated that the four criteria were satisfied, and, in any case, we agree with the district court's conclusion that she could not have satisfied criteria (3) and (4). Moreover, the district court permitted York's counsel to comment in the closing arguments on AT&T's failure to offer evidence

- 11 -

on how other AT&T facilities interpreted this language. The court did not abuse

its discretion by denying York's request for the missing witness instruction.

York's final challenge to the district court's instructions concerns her

disparate impact discrimination claim regarding AT&T's requirement of two years

of prior boiler room experience. York requested the court to instruct the jury that

she would be entitled to prevail even if the defendants could establish the

business necessity of the two-year experience requirement, provided that she

could present alternative selection criteria "that would also have served AT&Ts

legitimate needs but without the same disproportionate impact on women." The

district court rejected this request and instead instructed the jury that, to prevail

on this issue, York had to show that any alternative selection criteria would be

"equally as effective as Defendant AT&T's experience requirement in achieving

Defendant AT&T's legitimate employment goals." The district court's instruction

correctly stated the plaintiff's burden in disparate impact cases; as this court has

held, a plaintiff's alternative selection criteria must be equally effective in

meeting the employer's legitimate employment goals. Murphy v. Derwinski, 990

F.2d 540, 544 (10th Cir. 1993). The district court, therefore, did not abuse its

discretion in rejecting York's proposed instruction.


### III. The Grant of Summary Judgment to IBEW

York brought two claims against IBEW, alleging that the union (1) discriminatorily breached its duty of fair representation under Title VII when it refused to pursue her grievances and (2) acquiesced in AT&T's disparate treatment of women and its maintenance of a two-year experience requirement which had a disparate impact on women. IBEW moved for summary judgment on both of these claims. On the first claim, the district court denied the motion for summary judgment as it related to the trainee position and granted the motion with respect to the Operating Engineer position. On the second claim, the court granted IBEW's motion for summary judgment. York now appeals the grant of summary judgment on these claims. We review the district court's grant of summary judgment de novo, applying the same legal standard employed by the district court. Wolf v. Prudential Ins. Co. of Am., 50 F.3d 793, 796 (10th Cir. 1995). Under this standard, mere assertions and conjecture are not enough to survive summary judgment. Branson v. Price River Coal Co., 853 F.2d 768, 771-72 (10th Cir. 1988).

We turn first to the breach of fair representation claim. To establishing a prima facie Title VII claim against a union for a breach of its duty of fair representation, a plaintiff must show that (1) the employer violated the collective bargaining agreement with respect to the plaintiff, (2) the union permitted the violation to go unrepaired, thereby breaching the union's duty of fair

representation, and (3) there was some indication that the union's actions were motivated by discriminatory animus. Babrocky v. Jewel Food Co. & Retail Meatcutters Union, Local 320, 773 F.2d 857, 868 (7th Cir. 1985). The district court found that York failed to establish the third element--that IBEW was motivated by discriminatory animus in declining to pursue her grievance--in that she failed to submit any evidence demonstrating such motivation on the part of the union or any evidence from which a reasonable jury could find such motivation.

York contends that the fact that no other member of the union stood to benefit from IBEW's support of AT&T's interpretation of the collective bargaining agreement necessarily dictates an inference that discriminatory animus must have motivated the union's refusal to contest AT&T's interpretation. This contention is flawed. The collective bargaining agreement entitles IBEW to pursue grievances on any matter "arising with respect to the interpretation and application of this agreement or other terms and conditions of employment." However, IBEW is not compelled, either under this agreement or under Title VII, to pursue an individual member's grievance if the union reasonably disagrees with the basis for that grievance. A union's statutory duty of fair representation does not oblige it to take action on every grievance brought by every member. Vaca v. Sipes, 386 U.S. 171, 191-92 (1967). Indeed, if a union could be compelled to

take official action on every grievance, irrespective of merit, the union would quickly deplete its resources and credibility; and the arbitration machinery would eventually become overburdened. See id. at 191-92.

For more than twenty years, IBEW had consistently adhered to the understanding of the collective bargaining agreement shared by AT&T--that Operating Engineer applicants must possess practical experience. IBEW argues that it supported the experience requirement because of the significant risks and responsibility for others' safety involved in powerhouse operation. IBEW also notes that the classroom vocational training that York received did not include instruction in the repair of powerhouse equipment. IBEW has maintained this position with respect to both male and female applicants. The mere fact that no other union members possessed interests that were directly adverse to York's grievance does not constitute an indication of discriminatory animus on IBEW's part where a reasonable basis exists for the union's belief that a viable grievance did not exist. The experience requirement is a legitimate, non-discriminatory qualification for the job, and York failed to present evidence showing that the requirement was merely a pretext for discrimination.

York also contends that the conversation she had with Srejma, a conversation of which IBEW was aware, compels the conclusion that IBEW acted with discriminatory animus. This contention is incorrect, because obtaining a

Class I license entailed acquiring practical experience when the conversation occurred. Thus, Srejma's answer implicitly conveyed the experience requirement to York. Moreover, he indicated in subsequent testimony that he did not intend his statement to be taken as a complete list of qualifications for the job. The fact that IBEW did not share York's strained conclusion that Srejma's statement of qualifications was evidence of sexual discrimination by AT&T does not amount to an indication of discriminatory animus on the part of IBEW.

In addition, York claims that the union acquiesced in AT&T's allegedly discriminatory treatment of York and its maintenance of a two-year experience requirement that had a disparate impact on women. Under Title VII, a union may not refuse to file a valid discrimination claim against an employer on behalf of one of its members simply because that member belongs to a particular minority group. Goodman v. Lukens Steel Co., 482 U.S. 656, 666-69 (1987). We have held that "[a] union cannot acquiesce in a company's prohibited employment discrimination and expect to evade Title VII liability for such discrimination." Romero v. Union Pac. R.R., 615 F.2d 1303, 1311 (10th Cir. 1980). However, mere inaction does not constitute acquiescence. Acquiescence requires (1) knowledge that prohibited discrimination may have occurred and (2) a decision not to assert the discrimination claim. See Goodman, 482 U.S. at 669. In this case, the plaintiff failed to present evidence from which a reasonable jury could

conclude that IBEW possessed the requisite knowledge. York offered no evidence establishing either that IBEW knew of intentional discrimination against women by AT&T management regarding the Operating Engineer position or that IBEW was aware of any disparate impact effected by the practical experience requirement.

York argues that the fact that plant management had never employed a woman in the Operating Engineer position suffices to establish that IBEW knew that AT&T was intentionally discriminating against female candidates for this position. Drawing such a conclusion from the mere fact that no women had worked in the Operating Engineer position requires too many assumptions and logical leaps. The district court was therefore correct when it concluded that York had presented no evidence showing that IBEW knew of sex discrimination by AT&T regarding the position of Operating Engineer.

York also argues that the absence of women in the position suffices to establish IBEW's knowledge of the disparate impact of the experience requirement. This argument also must be rejected. The mere absence of women is insufficient to show that the experience requirement was the cause of any disparity in the number of men and women in the position, let alone that IBEW knew of and acquiesced in any such causality. On this issue as well, the district court correctly granted summary judgment to defendant IBEW.

## IV. York's Motions In Limine

In her motions in limine, York requested that the district court exclude evidence relating to: (1) medical treatment she received prior to 1992, specifically her hospitalization in a psychiatric facility in 1988; (2) bankruptcy proceedings she commenced in 1985; and (3) divorce proceedings involving her first husband, which began in 1968 and concluded in 1976, as well as her sexual conduct. The court rejected these motions and allowed the defendants to inquire into and offer evidence concerning all of these matters, with the exception of York's sexual conduct. York then asked the court to bifurcate the proceedings and try the liability issue first, allowing the challenged evidence only to come in when the parties litigated her claims for damages for emotional distress. The court declined to bifurcate the proceedings. York contends that the court erred, both in refusing to exclude the evidence and in refusing to bifurcate the trial. We review a district court's decision to admit or exclude evidence for abuse of discretion, disturbing its ruling only if the ruling was based on a clearly erroneous finding of fact, an erroneous conclusion of law, or an error of judgment. Cartier v. Jackson, 59 F.3d 1046, 1048 (10th Cir. 1995). As for York's alternate motion to bifurcate the proceedings, a district court possesses "broad discretion in deciding whether to sever issues for trial and the exercise of that discretion will be set aside only if clearly abused." Easton v. City of Boulder, 776 F.2d 1441, 1447 (10th Cir. 1985),

cert. denied, 479 U.S. 816 (1986).

In this case, the district court did not abuse its discretion by admitting the evidence. York sought damages for emotional distress allegedly suffered as a result of not obtaining the positions that she sought. She contended that she had become emotionally strained and had lost her self-esteem and enjoyment of life. The defendants maintained that much, if not all, of York's emotional distress was rooted in her past, stemming from events that occurred well before her unsuccessful bid for the Operating Engineer position in 1992. In particular, they note that her hospitalization in a psychiatric facility in 1988 was necessitated by various sources of stress in her life. Because York chose to raise a claim of emotional distress, it was entirely appropriate for the court to allow the defendants to introduce evidence of alternate or multiple causes of such distress. The jury must be permitted to consider such relevant evidence of causation where damages are claimed for emotional distress. Moreover, it would be inequitable to allow the plaintiff to introduce selected evidence on the matter but to disallow the defendants to present evidence supporting their theories of causation. See Hoppe v. G.D. Searle & Co., 779 F. Supp. 1413, 1419 (S.D.N.Y. 1991). For these reasons, the district court did not abuse its discretion in denying York's motions in limine regarding the evidence of alternate causes of emotional distress.

Nor did the court abuse its wide discretion in denying York's motion to

bifurcate the trial. Such decisions must be made with regard to judicial efficiency, judicial resources, and the likelihood that a single proceeding will unduly prejudice either party or confuse the jury. York has not shown that she was significantly prejudiced by the admission of such evidence or that the evidence should have been removed from the jury's consideration in determining the defendants' liability.

### V. Judicial Notice of the Disparate Impact of the Experience Requirement

At trial, York requested that the court take judicial notice that "few if any women in the Oklahoma City area would be able to satisfy a two-year experience requirement." The court declined to do so. We review a district court's refusal to take judicial notice for abuse of discretion. Klein v. Zavaras, 80 F.3d 432, 435 n.5 (10th Cir. 1996).

Judicial notice is an adjudicative device that alleviates the parties' evidentiary duties at trial, serving as "a substitute for the conventional method of taking evidence to establish facts." Grand Opera Co. v. Twentieth Century-Fox Film Corp., 235 F.2d 303, 307 (7th Cir. 1956). In this instance, before asking the court to take judicial notice, York had already presented evidence in support of her contention that few women in the Oklahoma City area would be able to satisfy the experience requirement. For the court to have taken judicial notice after the

presentation of evidence on the issue would have been redundant.

Moreover, judicial notice was not suitable for this factual assertion. Judicial notice is appropriate where a matter is "verifiable with certainty." St. Louis Baptist Temple, Inc. v. FDIC, 605 F.2d 1169, 1172 (10th Cir. 1979). It replaces the evidentiary procedure that would otherwise be necessary to establish "adjudicative fact[s]" that are generally known or "capable of accurate and ready determination" by resort to reliable sources. Fed. R. Evid. 201(b). The number of women in the Oklahoma City area that are able to satisfy AT&T's Operating Engineer experience requirement is not generally known; and although it is determinable, it is not readily so. For this reason as well, we conclude that the court did not abuse its discretion by refusing to take judicial notice.

## VI. The District Court's Refusal to Grant a New Trial

York moved for a new trial on her claim that the two year experience requirement had a disparate impact on the promotion of women to the Operating Engineer position. The district court declined to grant York's motion. We review a district court's ruling on a motion for a new trial for abuse of discretion. Sheets v. Salt Lake County, 45 F.3d 1383, 1390 (10th Cir.), cert. denied, 116 S. Ct. 74 (1995). A district court's discretion in this area is particularly broad, and its decision to grant or refuse a motion for a new trial will not be reversed absent a

gross abuse of discretion.  Holmes v. Wack, 464 F.2d 86, 89 (10th Cir. 1972).

Where a party moves for a new trial on the ground that the jury verdict is not

supported by the evidence, the verdict must stand unless it is "clearly, decidedly

or overwhelmingly against the weight of the evidence."  Black v. Hieb's Enters.,

Inc., 805 F.2d 360, 363 (10th Cir. 1986).

York contends that her statistical evidence, showing that just over six

percent of stationary engineers in Oklahoma and just over ten percent in the

Oklahoma City area are female, established with certainty that AT&T's two-year

experience requirement produced a disparate impact against women.  York also

contends that because AT&T used supervisors without prior experience to operate

the powerhouse on two prior occasions during strikes, AT&T's asserted business

necessity for the experience requirement was pretextual.  In response, the

defendants produced evidence concerning, among other things, the risks

associated with powerhouse operation and the fact that York's vocational courses

did not provide adequate training in the repair of powerhouse equipment.  This

evidence is sufficient to support the jury's conclusion that AT&T's experience

requirement was not pretextual.  We cannot say that the jury's verdict was clearly,

overwhelmingly, or decidedly against the weight of the evidence.  To do so would

be to supplant the jury's consideration of competing facts with our own, a course

upon which district courts and courts of appeals must not embark.  The district

- 22 -

court was therefore correct in denying York's motion for a new trial.

## VII.  The Grant of Summary Judgment Regarding York's Public Policy Claim

The district court granted summary judgment to the defendants on York's claim that AT&T's failure to promote her fell within the public policy tort exception to Oklahoma's termination-at-will doctrine.  York premised her claim upon the public policy theory articulated in Tate v. Browning-Ferris, Inc., 833 P.2d 1218 (Okla. 1992).  In that case, the court held that where an employer discharges an employee in violation of a public policy that is clearly articulated in constitutional, statutory, or decisional law, the employer may be held liable for a tortious breach of contractual obligations.  Id. at 1225.  However, in Sanchez v. Phillip Morris, Inc., 992 F.2d 244 (10th Cir. 1993), we held that Oklahoma's public policy exception to the termination-at-will doctrine was narrowly constructed and not intended to apply to all Title VII cases.  The exception was limited to wrongful terminations and did not extend to the failure-to-hire context. Id. at 249.  The same analysis applies here in the failure-to-promote context. Thus, on this claim, as on all of the claims discussed above, the decision of the district court is AFFIRMED.