WEIS, Circuit Judge,
dissenting:
The “minimum qualifications” criterion of business justification does not apply to all types of employment. When public safety is at stake, a lighter burden is placed on employers to justify their hiring requirements. Because I believe that the latter standard applies in this case, I would affirm.
I.
Concerned about its inability to control crime on its property, SEPTA instituted a three-pronged attack on the problem. It added a substantial number of officers, implemented a zone method of patrol, and adopted standards to improve the generally poor physical condition of its officers. Unlike many metropolitan police departments, SEPTA officers are deployed alone and on foot, engaging in physical activities more frequently than other law enforcement agencies.
The patrol zones present significant variations in conditions that affect the physical exertion of officers in the performance of their duties. Zone One, for example, has a climb of 30 to 50 steps from street level. Zone Three, a mixture of above and below-ground locations, borders a large shopping mall, featuring retail theft and pursuits that lead into the SEPTA transit system. Zone Five, which includes sports complexes, is characterized by long distances between stations. Zone Six includes the Temple University area, a scene of frequent crimes against students.
SEPTA officers must occasionally ask for assistance from their comrades in other zones. These calls are divided into two categories, “officer assists” and “officer backups.” An “assist” requires officers to respond immediately. Often the only method available to get to the scene quickly is a run of five to eight city blocks. An officer responding to an “assist” must pre *495 serve enough energy to deal effectively with a situation once arriving on the scene. SEPTA averages about 380 running assists per year. “Backups” are' not as critical as “assists,” so officers generally use a “paced jog.” SEPTA averages about 1,920 “backups” annually.
For help in attaining its fitness goals, SEPTA turned to Dr. Paul Davis, an acknowledged expert in the field who had recommended corrective measures for numerous law enforcement and government agencies. At the time Dr. Davis began his research for SEPTA, an officer’s equipment load was 12 pounds; it: is now nearly 26 pounds. Dr. Davis found that officers need “sound, intact, diseaseTfree cardiovascular systemfs]” to effectively perform their jobs. These requirements implicate aerobic capacity, ie., the ability of the body to utilize oxygen during sustained physical activities such as running, swimming, and cycling. Aerobic ■ capacity is commonly measured in units of milliliters óf oxygen per kilogram of body weight per minute' — “mL/kg/min,” or “mL.”
SEPTA officers typically run or jog on a daily basis from three to eight city blocks for periods of three to ten minutes. They also engage in stair climbing, which requires a capacity of 54 mL. In light of this and other evidence, Dr. Davis concluded that SEPTA transit officers need an aerobic capacity of 50 mL. After determining that such a level would have a “draconian” effect on female applicants, however, Dr. Davis lowered his recommendation to 42.5 mL. That capacity could be demonstrated by running 1.5 miles in 12 minutes, a test that was adopted for applicants.
Dr. Davis had done a similar study for a fire department in St. Paul, Minnesota, which — in setting a standard of 45 mL— required applicants to run 1.5 miles in 11 minutes and 40 seconds. Eighty percent of male applicants and 76% of female applicants passed this test.
In addition to Dr. Davis’ testimony, SEPTA also presented evidence from other experts to demonstrate a statistically significant correlation between aerobic capacity and the number of arrests made by individual SEPTA officers. Furthermore, of 207 commendations, 96% went to officers with an average capacity of 46 mL. Of these awards, 198 involved arrests, and 116 involved a foot pursuit, use of force or other physical- exertion. Another study indicated that 51.9% of offense perpetrators had a capacity of 48 mL or higher, with only 27% having lower than a 42 mL rating.
The record demonstrates that a smaller percentage of female applicants passed the running test than males, but that nearly all women who trained for it were able to pass. The named plaintiffs and some of the class members who failed demonstrated, for the most part, a “cavalier” attitude towards the running test. Videotapes showed some of these applicants walking at the halfway point, either because they were indifferent or unable to run for even that short a period of time. Thus, although there was a significant disparity between the pass-fail rates of male and female applicants, the extent of the difference appears to have been exaggerated to some extent by the approach taken by some of the applicants.
A physiologist, Dr. Lynda Ransdell, testified that 40% of all women starting at an aerobic capácity of 35 to 37 mL can train to pass the running test in eight weeks, and that 10% of all women between 20 and 29 years of age can do so without any training. She concluded that the average sedentary woman can achieve SEPTA’s performance standard with only moderate training. SEPTA sent applicants a letter outlining recommended training techniques that Dr. Ransdell testified were adequate.
Plaintiffs introduced the testimony of Dr. William klcArdle, who suggested the use of- a “relative fitness” test in which all applicants would be required to meet the 50th percentile of aerobic capacity for their gender — approximately 42 mL for males, *496 and 36 mL for females. However, Dr. Robert Moffatt, a defense expert who conducted tests of the aerobic capacity necessary to perform a SEPTA officer’s duties, disagreed. He stated that female officers with a capacity of 36 mL would not be able to capably perform their duties after running to an “assist” or a “backup.” Dr. Bernard Siskin, another defense expert, found that the arrest rate for females with a 36 mL capacity was significantly lower than that of males with a 42 mL capacity.
The District Court rejected Dr. McAr-dle’s proposal because it would not serve SEPTA’s business goal of providing a police force capable of performing the physical requirements of the job nearly as well as the existing test. Instead, the court found that “Dr. Davis’ study, standing alone, met the professional standards for construct validation and satisfies defendant’s burden of demonstrating job relatedness and business necessity.” Moreover, his study had sufficient empirical support for an aerobic capacity requirement of 42.5 mL.
II.
The dispute in this case centers on the applicable standard of business justification under the Civil Rights Act of 1991. See Pub.L. No. 102-166, Title I, § 105(a), 105 Stat. 1074-75 (adding 42 U.S.C. § 2000e-2(k)). The pertinent section provides: “An unlawful employment practice based on disparate impact is established ... only if — [the] complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of ... sex ... and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity!.]” 42 U.S.C. § 2000e-2(k)(l)(A).
This addition to Title VII was passed in response to the Supreme Court’s decision in Wards Cove Packing Co., Inc. v. Atonio, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). In that case, the Court held that after a plaintiff makes a prima facie showing of disparate impact, the defendant bears the burden to produce evidence of business justification. See id. at 659, 109 S.Ct. 2115. The burden of persuasion, however, remains at all times with the plaintiff. See id. As to what showing would satisfy business justification, the Court held that “the dispositive issue is whether a challenged practice serves, in a significant way, the legitimate employment goals of the employer.” Id. However, “there is no requirement that the challenged practice be ‘essential’ or ‘indispensable’ to the employer’s business for it to pass muster.” Id.
Some members of Congress were displeased with the result in Wards Cove and argued for a stricter standard of business justification based on their reading of pre-Wards Cove cases. After two years of legislative struggle, Congress and the President agreed upon a compromise bill. Whether the ambiguous language of the statute accomplished that purpose has been the subject of lively debate.[1]
*497 The 1990 bill, which had been vetoed by the President,[2] had used the phrase “required by business necessity,” rather than “consistent with business necessity,” as used in the 1991 Act. The substitution of the word “consistent” was considered to indicate a standard. less stringent than would “required.” In that light, a fair reading of the 1991 Act is “the challenged practice is job related for the position in question and in harmony with business necessity.”
It may fairly be said that the language ultimately adopted in the 1991 Act reflects an “agreement to disagree” and a return of the dispute to the courts for resolution. In short, unable to muster a veto-proof majority for either view, Congress “punted.” This conclusion is underscored by Congress’ highly unusual admonition that the courts consider only a designated “interpretive memorandum” as legislative history, rather than the more elaborate committee reports and other materials that customarily reveal the extent of the controversy between various views. See Pub.L. No. 102-166, Title I, § 105(b), 105 Stat. 1075. The interpretive memorandum states that: “The terms ‘business necessity’ and ‘job related’ are intended to reflect the concepts enunciated by the Supreme Court in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and in the other Supreme Court decisions prior to Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989).” 137 Cong. Rec. S15276 (daily ed. Oct. 25, 1991).
Congress’ reference to the Griggs line of Supreme Court decisions, however, does little to clear the air because the language in those opinions has caused confusion.[3] The problem can ultimately be traced back to Griggs itself. In that case, which involved power-plant jobs, the Court held that a high school completion requirement and general intelligence tests that disproportionately disqualified black applicants were not significantly job related. The Court said: “The touchstone is business necessity.” Griggs, 401 U.S. at 431, 91 S.Ct. 849. However, the very next sentence reads, “[i]f an employment practice ... cannot be shown to be related to job performance, the practice is prohibited.” Id. Thus, the Court speaks of both “necessity” and “job-relatedness” in the same breath.
In the following paragraph, we read that neither employment requirement is “shown to bear a demonstrable relationship to successful performance of the jobs for which it was used. Both were adopted ... without meaningful study of their relationship to job-performance ability.” Id. The Court also refers to “testing meeha-nisms[that are] unrelated to measuring job capability,” “job-related tests,” and states that “any given requirement must have a manifest relationship to the employment in question.” Id. at 432-34, 436, 91 S.Ct. 849. Not once does the opinion repeat or expound upon “business necessity.” Unquestionably, “job-relatedness” is Griggs ’ dominant thread.
The Court also cited with approval former EEOC Guideline 29 C.F.R. § 1607.4(c), which required employers to' *498 produce data “demonstrating that the test is predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated.” Id. at 433 n. 9, 91 S.Ct. 849.
The Court next visited the concept of business justification in Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), where a paper mill was using screening tests that had a disparate impact on black applicants. The issue, according to the Court, was whether the employer had shown the tests to be “job related.” Id. at 408, 95 S.Ct. 2362. The Court concluded that the employer’s validation study was defective because it “involved no analysis of the attributes of, or the particular skills needed in, the studied job groups.” Id. at 432, 95 S.Ct. 2362. The Court was also critical of hiring decisions based on the subjective opinions of supervisors. See id. at 432-33, 95 S.Ct. 2362.
The portion of Albemarle most relevant to the case at hand focused on whether tests that take into account capability for promotion may be utilized if such long-range requirements fulfill a “genuine business need.” Id. at 434, 95 S.Ct. 2362. The employer’s validation study focused on the scores achieved by job groups near the top of the various lines of progression. .The Court observed that those results did “not necessarily mean that the test, or some particular cutoff score on the test, is a permissible measure of the minimal qualifications of new workers entering lower level jobs.” Id. at 434, 95 S.Ct. 2362. Thus, the validation study was faulty because there had been “no clear showing that differential validation was not feasible for lower level jobs.” Id. at 435, 95 S.Ct. 2362.
The Court next considered appropriate criteria in Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), which involved written tests that allegedly had a discriminatory impact on black applicants for police officer positions. Although the suit was not brought under Title VII, the Court discussed Griggs and Albemarle. The district judge had concluded “that a positive relationship between the test and training-course performance was sufficient to validate the[test], wholly aside from its possible relationship to actual performance as a police officer.” Id. at 250, 96 S.Ct. 2040. Significantly, the Supreme Court remarked that such a conclusion was not foreclosed by either Griggs or Albemarle and “it seems to us the much more sensible construction of the job-relatedness requirement.” Id. at 250-51, 96 S.Ct. 2040. Dismissing challenges to the test, the Court remarked that “some minimum verbal and communicative skill would be very useful, if not essential, to satisfactory progress in the training regimen.” Id. at 250, 96 S.Ct. 2040.
In another case, Dothard v. Rawlinson, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), the Court held that height and weight requirements for prison guards could not stand. The ruling was based on the employer’s failure to produce any evidence to correlate those standards with “the requisite amount of strength thought essential to good job performance.” Id. at 331, 97 S.Ct. 2720. In a footnote, Dothard repeated Griggs ’ statement that “[t]he touchstone is business necessity,” and further stated that “a discriminatory employment practice must be shown to be necessary to safe and efficient job performance to survive a Title VII challenge.” Id. at 332 n. 14, 97 S.Ct. 2720. Earlier in the body of the opinion, the Court explained that the employer must show that a requirement has “ ‘a manifest relationship to the employment in question.’ ” Id. at 329, 97 S.Ct. 2720 (quoting Giiggs, 401 U.S. at 432, 91 S.Ct. 849).
In yet another context, the Court upheld an employer’s prohibition of employment to users of methadone, despite claims of disparate impact on blacks and Hispanics. See New York City Transit Authority v. Beazer, 440 U.S. 568, 587, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979). To the Court, the *499 employer’s narcotics rule, éven in its application to methadone users, was “job related.” Id.
Beazer quoted the District Court’s observation that “those goals [ie., safety and efficiency] are significantly served by— even, if they do not require — [the employer’s] rule as it applies to all methadone users including those who are seeking emr ployment in non-safety-sensitive positions.” Id. at 587 n. 31, 99 S.Ct. 1355. The Supreme Court concluded that “[t]he record thus demonstrates that [the employer’s] rule bears a ‘manifest relationship to the employment in question.’ ” Id. (quoting Griggs, 401 U.S. at 432, 91 S.Ct. 849).
The Beazer Court observed that most of the affected job positions were “attended by unusual hazards and must be performed by ‘persons of maximum alertness and competence.’ ” Id. at. 571, 99 S.Ct. 1355. Other positions were “critical” or “safety sensitive,” and many involved “danger to [the employees] or to the public.” Id.
III.
As the preceding sketch of pr e-Wards Cove opinions demonstrates, the Supreme Court’s articulations of the appropriate standards are far from clear. Phrases such as “business necessity,”' “demonstrable relationship to successful performance of the job,” “manifest relationship to the employment in question,” “genuine business needs,” and ‘‘essential, to good job performance,”' have been used interchangeably. These varying formulations bring to mind Justice Holmes’ observation, “A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according'to the circumstances and the time in which it is used.” Towne v. Eisner, 245 U.S. 418, 425, 38 S.Ct. 158, 62 L.Ed. 372 (1918).
My study of the standard for business justification as set forth by the Civil Rights Act of 1991 convinces me that it remains essentially the same as it was in the pr e-Wards Cove era. However, other than its holding on burden of proof, it does not seem that Wards Cove was a revolutionary pronouncement. Until the Supreme Court reexamines the subject, however, courts will continue to struggle with, the often inconsistent phraseology employed in Griggs and its progeny. The definition and application of the appropriate standard for business justification will depend on the context in which it is raised.
There are significant factual differences in the cases that explain, to some extent, the differing formulations. Albemarle and Griggs applied greater scrutiny when the disparate impact affected entry to lower-level jobs, where it is fair to assume that no special qualifications would be generally expected.
In contrast, Beazer and Washington raised an additional important consideration — public safety. Beazer concerned jobs involving serious dangers to employees as well as to transit passengers. In Washington, a written test demonstrating an applicant’s ability to complete police officer training was job-related, even apart from its relationship to actual performance as a police officer. The impact of public safety concerns on employee qualifications is inescapable, and serves to differentiate those positions from lower-level, nonsafety-sensitive ones.[4]
The Courts of Appeals have explicitly recognized the relevance of safety considerations in a series of decisions beginning with Spurlock v. United Airlines, Inc., 475 F.2d 216 (10th Cir.1972). In that case, an airline required that applicants for flight officer positions have a college degree and a minimum of 500 flight hours. The Court, citing Griggs, held that where “the job clearly requires a high degree of skill and the economic and human risks in *500 volved in hiring an unqualified applicant are great, the employer bears a correspondingly lighter burden to show his employment criteria are job related.” Id. at 219. Because, in the case of pilots, “[t]he risks involved in hiring an unqualified applicant are staggering .... [t]he courts ... should proceed with great caution before requiring an employer to lower his pre-employment standards for such a job.” Id.
Another leading case, Davis v. City of Dallas, 777 F.2d 205 (5th Cir.1985), applied the Spurlock doctrine to criteria for hiring police officers. The City required a specific amount of college education, no history of recent marijuana usage, and a negative history of traffic violations. Despite findings of disparate impact, the Court upheld the requirements. Having reviewed the many cases following Spur-lock, the Court had “no difficulty ... equating the position of police officer in a major metropolitan area such as Dallas with other jobs that courts have found to involve the important public interest in safety.” Id. at 215 (internal quotation marks omitted). The degree of public risk and responsibility alone “would warrant examination of the job relatedness of the ... education requirement under the lighter standard imposed under Spurlock and its progeny.” Id. at 215.
Observing the nature of the positions at issue in Griggs and Albemarle, Davis noted that in neither case did the Supreme Court suggest that those jobs “were noteworthy for their dangerousness or importance to the public welfare.” Id. at 210. In contrast, the employment under consideration in Davis directly implicated public safety concerns. See id. at 211. It is interesting that Justice Blackmun, in Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988) (plurality op.), objecting to what he considered to be a tendency to weaken the employer’s burden, cited Davis favorably, stating that “[t]he proper means of establishing business necessity will vary with the type and size of the business in question, as well as the particular job” in question. Id. at 1007, 108 S.Ct. 2777. (Blackmun, J., concurring in part and concurring in the judgment)[5]
In a post-Wards Cove case involving firefighters, the Court of Appeals for the Eleventh Circuit noted that such “safety claims would afford the City an affirmative defense, for protecting employees from workplace hazards is a goal that, as a matter of law, has been found to qualify as an important business goal for Title VII purposes.” Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1119 (11th Cir.1993) (citing Beazer, 440 U.S. at 587 & n. 31, 99 S.Ct. 1355; Dothard, 433 U.S. at 331 n. 14, 97 5.Ct. 2720). Thus, “[m]easures demonstrably necessary to meeting the goal of ensuring worker safety are therefore deemed to be ‘required by business necessity’ under Title VII.” Id.
In a similar case, the Court of Appeals for the Eighth Circuit wrote that “the law does not require the city to put the lives of [plaintiff] and his fellow firefighters at risk by taking the chance that he is fit for duty when solid scientific studies indicate that persons with test results similar to his are not.” Smith v. City of Des Moines, 99 F.3d 1466, 1473 (8th Cir.1996). Other Courts of Appeals have reached similar conclusions in cases involving safety-sensitive positions such as truck drivers, bus drivers, firefighters, and police officers.[6]
*501 IV.
The issues thát separate the parties are straightforward. Plaintiffs do not seriously contest the fact that aerobic capacity is a valid predictor of efficient job performance as a transit police officer. They do not challenge the finding that running for 1.5 miles is an effective way to measure aerobic capacity. Nor apparently do they suggest that 42.5 mL is an inappropriate cut-off for male applicants: they implicitly accept this standard by advancing Dr. McArdle’s alternative test, which would use that score for males and a lower one for females.
Even the government plaintiff concedes that an employer may improve its. workforce. U.S. Br. at 35 (citing Griggs, 401 U.S. at 431, 91 S.Ct. 849).[7] Griggs, in turn, stressed that tests “must measure the person for the job and not the person in the abstract.” Griggs, 401 U.S. at 436, 91 S.Ct. 849. SEPTA’s running test attempts to do just that, i.e., improve the caliber of its police force by selecting new hires to fit appropriately heightened performance standards.
A fair appraisal of the plaintiffs’ objection is that the running test’s cut-off requires female applicants to run faster than a majority of women can run without training. However, nearly all of the women who did train were able to pass the test. Also, not all males were able to pass, although their failure percentages were substantially lower.
Plaintiffs complain that SEPTA cannot point to any instances where a perpetrator of a crime got away, or an offense was committed because of an officer’s lack of aerobic capacity. But as noted by Fitzpatrick, “[t]he mere absence of unfortunate incidents is not sufficient” to preclude a particular safety requirement because otherwise, such “measures could be instituted only once accidents had occurred rather than in order to avert accidents.” Fitzpatrick, 2 F.3d at 1120-21.
Here, where applicants have it within their power to prepare for the running test, they may properly be expected to do so. In view of the important public safety concerns at issue, it is not unreasonable to expect all applicants — female or male — to take the necessary steps in order to qualify for the positions.
The District Court’s conclusions must-be appraised against this background. The trial was lengthy and the evidence extensive. The findings of fact on job needs with respect to aerobic capacity are not clearly erroneous. This conclusion is mandated by the standard that clear error exists only when, on the entire evidence, a court is left with the definite, firm conviction that a mistake has been committed. See Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). If the account of the *502 District Court is “plausible in light of the record viewed in its entirety,” we may not reverse even if we are convinced that had we “been sitting as the trier of fact, [we] would have weighed the evidence differently.” Id. at 574,105 S.Ct. 1504.
Moreover, “[w]here there are two permissible views of the evidence, the factfin-der’s choice between them cannot be clearly erroneous.” Id. “This is so even when the district court’s findings ... are based instead on physical or documentary evidence or inferences from other facts.” Id. Where findings are based on credibility determinations, appellate review accords even greater deference to the findings of the District Court. See id. at 575, 105 S.Ct. 1504. Courts routinely hold that business justification is reviewed for clear error. See, e.g., Davis, 777 F.2d at 208 & n. 1; Spurlock, 475 F.2d at 219-20. I accept, therefore, that 42.5 mL is an appropriate level for the position of a SEPTA officer, that it is reasonable, and that it is attainable by otherwise physically fit female applicants with moderate training.
The question then, is whether SEPTA’s standard is permissible under the terms of the Civil Rights Act of 1991 and the relevant precedents. The District Court rejected the plaintiffs’ contention that “business necessity” under the statute is governed by a footnote in Dothard that states: “[A] discriminatory employment practice must be shown to be necessary to safe and efficient job performance....” Dothard, 433 U.S. at 332 n. 14, 97 S.Ct. 2720. Rather, looking to Griggs and Beazer, the Distinct Court stated that SEPTA need only show that its tests “significantly serve, but are neither required by nor necessary to, the employer’s legitimate business interests” — in other words, that it '“bears a manifest relationship” to the employment in question.
In disagreeing with the criteria used by the District Court, the majority holds that “a discriminatory cutoff score is impermissible unless shown to measure the minimum qualifications necessary for successful performance of the job in question.” The difficulties presented by this standard are illustrated by the testimony of Dr. McArdle, the plaintiffs’ expert. In essence, he proposed that female applicants be expected to meet 50% of their aerobic capacity, translating to 36 mL, but that males continue at the 50% level of 42.5 mL. That standard would, of course, have less adverse impact on women, but according to the findings of the District Court, would also have a detrimental impact on the effectiveness of the SEPTA transit police.
With this in mind, I cannot agree that the majority’s standard is the correct one for this case. Reducing standards towards the lowest common denominator is particularly inappropriate for a police force. Undoubtedly, candidates who fail the running test — female or male — may have other qualities of particular value to SEPTA, but they must possess the requisite aerobic capacity as well. No matter how laudable it is to reduce job discrimination, to achieve this goal by lowering important public safety standards presents an unacceptable risk.
Aerobic capacity is an objective, measurable factor which gauges the ability of a human being to perform physical activity. The aerobic demands on the human system are affected by absolutes such as the distance traveled, the speed, the number of steps to be climbed, and similar factors. Governmental agency pronouncements will not shorten distances, reduce the number of steps, or decrease the aerobic capacity of perpetrators to match the reduced standards of officers, male or female.[8] Some *503 males and more females cannot meet the necessary requirements. Based on the facts established at trial, those individuals simply cannot perform the job efficiently. To the extent that they cannot, their hire adversely affects public safety.
The current Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607 (“EEOC Guidelines”), are not as strict as the standard suggested by the majority. In discussing cut-off scores, the Guidelines explicitly state that “they should normally be set so as to be reasonable and consistent with normal expectations of acceptable proficiency within the work force.” 29 C.F.R. § 1607.5(H) (1998). Further, the EEOC Guidelines standard — “predictive of or significantly correlated with important elements” — has been cited by the Supreme Court with approval on several occasions. See Albemarle, 422 U.S. at 431, 95 S.Ct. 2362 (quoting former 29 C.F.R. § 1607.4(c)); Griggs, 401 U.S. at 433 n. 9, 91 S.Ct. 849 (quoting same); see also 29 C.F.R. § 1607.5(B) (1998).
Further, Albemarle’s reference to “minimal qualifications” was directed only to the inappropriateness of using a test geared towards higher-level jobs as a screen for entry-level positions. See Albe-marle, 422 U.S. at 434, 95 S.Ct. 2362. This holding, which is minimally relevant to the matter at hand, is doubly inapplicable when the job affects public safety. See Davis, 777 F.2d at 211 n. 5.[9]
I see no need to remand this case to the District Court. Whatever standard is used, the findings of fact require an affir-manee. Although the District Court rejected the plaintiffs’ argument that the Dothard footnote, rather than Beazer, supplied the proper standard, the factual findings make it clear that under either formulation, the District Court reached the correct result.
The Dothard footnote states that the challenged practice must be “necessary to safe and efficient job performance.” Do-thard, 433 U.S. at 331 n. 14, 97 S.Ct. 2720. The District Court, also in a footnote, wrote “physical fitness is only one trait or ability required of SEPTA officers, [but] it is a trait or ability that is necessary for and critical to the successful performance of the job, and thus SEPTA should be able to test for such a trait.” This finding more than complies with Dothard’s footnote by concluding that not only is physical fitness “necessary” to safe and efficient job performance as SEPTA officers, but that it is “critical” to successful performance of these jobs. Moreover, the finding clearly meets even the criterion that cut-off scores “measure the minimum qualifications necessary for successful ■performance of the job.” (emphasis added).
Nor can there be any doubt that the factual findings here satisfy Griggs ’ requirement of “business necessity.” Unquestionably, SEPTA’s test is job-related and there can be no doubt that physical fitness, and particularly aerobic capacity, is necessary for adequate performance of the job of a SEPTA transit officer. The findings are convincing that 42.5 mL is a *504 reasonable cut-off point for determining the physical ability necessary for successful performance of the job. Consequently, even under the plaintiffs’ reading of the 1991 Act, which relies so much on Do-thard, the judgment in favor of the defendant should be affirmed.
To my mind, the correct standard for this case is that of Spurloch-Davis, one that places greater emphasis on the safety of the public and fellow officers. I have no doubt that this line of cases survives the Civil Rights Act of 1991, because those opinions — as noted in Congress’ “interpretive memorandum” — “reflect the concepts enunciated” in Supreme Court decisions prior to Wards Cove. See Watson, 487 U.S. at 998, 108 S.Ct. 2777; Beazer, 440 U.S. at 587 n. 31, 99 S.Ct. 1355; Washington, 426 U.S. at 250, 96 S.Ct. 2040; Smith, 99 F.3d at 1473; Fitzpatrick, 2 F.3d at 1119. Safety concerns are clearly “concepts” considered by the Supreme Court and applied in various factual circumstances by the Courts of Appeals, both in pre and post-Wards Cove cases. Nothing in the legislative history casts any doubt on the continued viability of these opinions.
Although it did not cite Spurloch-Davis, the District Court stated in its conclusions of law that “employers such as SEPTA should be encouraged to improve the efficiency of its workforce, especially where public safety is implicated by the particular job as it is with SEPTA.” More emphatically, it stated that “[t]he Court simply will not condone dilution of readily obtainable physical abilities standards that serve to protect the public safety in order to allow unfit candidates, whether they are male or female, to become SEPTA transit police officers.”
Although the District Court only inferentially applied Spurlock-Davis, I would do so explicitly and affirm the judgment on that basis.[10] Here, the record supplies ample evidence about safety concerns related to the performance of SEPTA officers. In cases such as these, courts should decline to lower standards in an effort to reduce disparate impact when that goal comes at the expense of public safety. Due deference should be afforded to the experience of specialized employers in setting appropriate requirements for safety-sensitive positions.
V.
The Lanning appellants propose a number of alternative practices that they suggest would have a lesser disparate impact while still serving SEPTA’s goals. First, they suggest that SEPTA select medically fit applicants who pass fitness requirements at the end of their training at the Philadelphia Police Academy. Second, as noted earlier, they argue in favor of a relative fitness test (ie., one with a lower cut-off point for females). Third, they prompt SEPTA to propose an alternative.
For plaintiffs to establish a satisfactory alternative, they must “make[ ] the demonstration described in [42 U.S.C. § 2000e-2(k)(l)(C) ] with respect to an alternative employment practice and [establish that] the[employer] refuses to adopt such alternative employment practice.” 42 U.S.C. § 2000e-2(k)(l)(A)(ii). To meet this burden, the plaintiffs’ proposed alternatives must have less disparate impact and “also serve the employer’s legitimate interest in ‘efficient and trustworthy workmanship.’ ” Albemarle, 422 U.S. at 425, 95 S.Ct. 2362; see also NAACP v. Medical Ctr., Inc., 657 F.2d 1322, 1336 n. 17 (3d Cir.1981) (en banc). As stated in Watson, the alternative test must “be equally as effective as the challenged practice in serving the em *505 ployer’s legitimate business goals.” Watson, 487 U.S. at 998,108 S.Ct. 2777.
The District Court found that none of the plaintiffs’ proposals served SEPTA’s legitimate interest in having a more physically fit work force. If SEPTA may require an aerobic capacity of 42.5 mL after training at the police academy, as plaintiffs propose, it is unclear how that practice would be any less discriminatory than requiring it before hire. In short, that plan would simply require that training be on “company time” rather than on that of the applicants.
As to the relative fitness test proposed by the plaintiffs’ expert, the factual findings demonstrate that officers with a capacity of 36 mL do not serve SEPTA’s needs as well as the required standard of 42.5 mL.[11] Finally, the proposal that SEPTA come forward with an alternative is not an alternative at all. Thus, plaintiffs have failed to meet their burden to establish an alternative employment practice.
I would affirm the judgment of the District Gourt.

. See Peter Brandon Bayer, Mutable Characteristics and the Definition of Discrimination Under Title VII, 20 U.C. Davis L.Rev. 769, 822 & n. 213 (1987) ("Both the Supreme Court and lower court rulings offer a confusing patchwork of seemingly conflicting standards.”).

. See Andrew C. Spiropoulos, Defining the Business Necessity Defense to the Disparate Impact Cause of Action: Finding the Golden Mean, 74 N.C. L.Rev. 1479 (1996).

. In the analogous context of the defense of bona fide occupational qualification, the Supreme Court has stated: " 'The greater the safety factor, measured by the likelihood of harm and the probable severity of that harm in case of an accident, the more stringent may be the job qualifications... .’ ” Western Air Lines, Inc. v. Criswell, 472 U.S. 400, 413, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985) (quoting with approval Usery v. Tamiami Trail Tours, Inc., 531 F.2d 224, 236 (5th Cir.1976)).

. See, e.g., York v. American Telephone & Telegraph Co., 95 F.3d 948, 952, 959 (10th Cir.1996) (powerhouse operating engineers); Zamlen v. City of Cleveland, 906 F.2d 209, 217 (6th Cir.1990) (firefighters); Hamer v. City of Atlanta, 872 F.2d 1521, 1535 (11th Cir.1989) *501 (firefighters); Levin v. Delta Air Lines, Inc., 730 F.2d 994, 997-98 (5th Cir.1984) (flight attendants); Chrisner v. Complete Auto Transit, Inc., 645 F.2d 1251, 1261-63 (6th Cir.1981) (truck yard employees); Harriss v. Pan American World Airways, Inc., 649 F.2d 670, 676 (9th Cir.1980) (flight attendants); McCosh v. City of Grand Forks, 628 F.2d 1058, 1063 (8th Cir.1980) (police); Boyd v. Ozark Air Lines, Inc., 568 F.2d 50, 54 (8th Cir.1977) (airline pilots); see also Alito, supra, at 1033-35 & n. 100.

. It is interesting that in the legislative history of the original text of Title VII, congressional advocatés argued that "title VII Would not require, and no court could read title VII as requiring, an employer to lower or change the occupational qualifications he sets for his employees....” 110 Cong. Rec. 7246-47 (April 8, 1964) (interpretive memorandum of Sen. Case). Senators Clark and Case stated that the “employer may set his qualifications as high as he likes....” Id. at 7213 (April 8, 1964) (interpretive memorandum of Sens. Clark and Case). Senator. Humphrey stated that "[t]he employer, not the Government, will establish the standards.” Id. at 13088 (June 9, 1964). Thus, the legislative history of Title VII “clearly reveals that Congress was concerned about preserving employer freedom, and that it acted to mandate employer color-blindness with as little intrusion into the free enterprise system as possible.” Contreras v. City of Los Angeles, 656 F.2d 1267, 1278 (9th Cir.1981).

. Although the government is a plaintiff in this dispute, I would note that some agencies take a somewhat different tack on the issue of aerobic fitness. The U.S. Forest Service, for instance, requires firefighters to have an aero-
bic capacity of 45 to 48 mL, and recommends one of up to 50. See United States Department of Agriculture, Forest Service, Technology & Development Program, Fitness and Work Capacity 51 (2d ed.1997). Notably, that *503 agency currently uses a 1.5 mile run test. See id. at 50-51.
Also, the Presidential Physical Fitness Award is available to children who meet the 85th percentile of fitness by meeting target levels in events such as a one-mile run. See Qualifying Standards (updated Oct. 15, 1998). http://www.indiana.edu/# Al# preschal/quali-fying.html>.
The Centers For Disease Control and Prevention lament that more than 60% of U.S. adults do not engage in the recommended amount of activity, and 25% are not active at all. See Physical Activity and Health, Adults (viewed May 7, 1999) hup:// www.cdc.gov/nccdphp/sgr/ adults.htm>.

. The plaintiffs also suggest that SEPTA’s validation studies were insufficient. However, strict compliance with the EEOC Guidelines is not necessary in all cases. See Beazer, 440 U.S. at 587 n. 31, 99 S.Ct. 1355; Washington, 426 U.S. at 250-51, 96 S.Ct. 2040. In cases involving public safety, courts have held that empirical validation is not required. See Boyd, 568 F.2d at 54.

. An order of the District Court may be affirmed on alternative grounds where the judgment is supported by the record below. See Guthrie v. Lady Jane Collieries, Inc., 722 F.2d 1141, 1144-45 & n. 1 (3d Cir.1983) (citing Helvering v. Gowran, 302 U.S. 238, 245, 58 S.Ct. 154, 82 L.Ed. 224 (1937)).

. The Civil Rights Act of 1991 presents another potential barrier to the relative fitness test. Subsection 2000e-2(Z) prohibits "in connection with the selection or referral of applicants or candidates for employment ... to ... use different cutoff scores for ... employment related tests on the basis of ... sex[.]” By its plain language, 42 U.S.C. § 2000e-2(Z) arguably prohibits a relative fitness test. The District Court concluded that this provision did not apply. I have some doubt on that ruling, but need not reach that issue because I would affirm on other bases.