[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, State of Connecticut, department of transportation ("the department"), appeals from the final decision of the defendant, commission on human rights and opportunities ("the commission"), finding that the defendant, Jayantha Mather, was illegally denied a promotion by the department because of his race and national origin. In the underlying complaint filed with the commission, Mather alleged that the department violated General Statutes § 46a-60 (a)(1) and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. and the Civil Rights Act of 1991 as enforced through General Statutes § 46a-58 (a).[1]
The plaintiff appeals from the commission s decision pursuant to General Statutes §§ 46a-94a and 4-183 of the Uniform Administrative Procedure Act ("UAPA").
The following facts from the human rights referee's decision are relevant to this appeal.
 2. Mather . . . is a native of Sri Lanka [who began work for the [department] in September 1982 as an Engineer Intern].
 *** 4. The [department] is organized into five Bureaus, each supervised by a Bureau Chief. . . .
 5. The five Bureaus are: Bureau of Finance and Administration, Bureau of Aviation and Ports, Bureau of Engineering and Highway Operations, Bureau of Policy and Planning, and Bureau of Public Transportation.
 6. The Bureau of Engineering and Highway Operations is supervised by James Byrnes.
 7. [One of the offices in the Bureau of Engineering Highway Operations is] the Office of Engineering. . . . Prior to July 1997, the Administrator for the Office of Engineering . . . was Earle Munroe, who retired on July 31, 1997. . . . In early to mid-September 1997, Walter Coughlin became the Engineering Administrator.
8. [One of the divisions in the Office of Engineering is the] Design Services Division, supervised by Joseph Obara. . . . CT Page 10706
 9. After July 1997, the Design Services Division is comprised of five units: Bridge Design; Utilities; Contracts; Hydraulics and Drainage; and Soils and Foundations. . . .
 10. Within the Soils and Foundations Unit in the Design Services Division, the engineering positions from highest to lowest are Transportation Principal Engineer ("TPE"), Transportation Supervising Engineer ("TSE"), Transportation Engineer 3, Transportation Engineer 2, Transportation Engineer 1, and Transportation Engineer Intern.
 11. The Soils and Foundations Unit provides geo-technical expertise for projects of all types, and is the only such unit at [department], and for other state agencies.
 12. The Soils and Foundations Unit is responsible for ensuring that the ground upon which highways, bridges or buildings are built is capable of supporting whatever is built upon it.
 13. The Soils and Foundation Unit performs highly technical and extremely critical engineering work. . . . A mistake in soils and foundations engineering work is usually hidden, and the consequences can be catastrophic, such as a bridge footing being washed out, or a road sliding into the ocean.
 14. Mather is currently employed as a TSE, a high level technical engineering position, in the Soils and Foundations Unit. . . .
 *** 21. [After some years as an intern], [i]n 1985, [Mather] took the Engineer 3 written exam, a four-hour test administered by the [department] specifically on soil-related issues. He . . . was promoted to Engineer 3 in the Soils and Foundation Unit.
22. Robert Isabelle supervised the Soils and Foundations Unit from December 1984 to March 1991. Isabelle held three different titles during his tenure. In reverse chronological order, those positions were Transportation Assistant Director of Soils and Foundations, Transportation Chief of Soils and Foundations, Transportation Engineer of Soils and Foundations. All three positions required the incumbent to have a PE license. Isabelle had his PE license. CT Page 10707
23. Isabelle accepted early retirement in March 1991. . . .
 24. After Isabelle's retirement Clem Zawodniak temporarily supervised the Soils and Foundations Unit. . . .
 ***
26. When [Theodore] Batko applied for the position as Head of Soils and Foundations in 1992 . . . [a]pplicants were expressly required to have a PE license. *** 32. In March 1992, Mather assumed the responsibilities of TSE [provisionally].
 *** 35. While serving as a TSE, Mather, along with two other TSEs, George Gonzales, an Hispanic male, and Leo Fontaine, a white male, was supervised by Theodore Batko.
 *** 40. Joseph Obara, manager of the Design Services Division, participated in the interview to fill the TSE position [permanently]. The decision makers included Obara, Batko and James Byrnes, Bureau Chief of Engineering . . . In September 1992, Fontaine received the promotion to the TSE permanent position. Mather was rejected.
 41. As a result of this rejection, Mather filed a complaint with the Commission alleging discriminatory conduct. Specifically, Mather complained that Obara and others denied him a promotion because of his color, race, and national origin, the same issues raised in this case.
 42. In March 1993, as a result of the settlement of his complaint, Mather was appointed a TSE on a permanent basis, along with Fontaine.
 ***
49. The first effective date for the TPE job specification was September 16, 1994. CT Page 10708
 50. The TPE job specification was developed, in part, to provide a more generic lob classification for a level of supervisors; to eliminate the disparities in salary grades for the "Engineer of' series of job specifications; and to alleviate the "silo" effect in engineering career paths caused by the "Engineer of" job specifications.
 *** 54. The TPE job specification gives [the department] the discretion to impose the listed licensure requirements on none, all or some of the TPE positions.
 55. In late 1994, Mather first applied for the TPE position. . . . [He] was not told that a PE license was a prerequisite to be eligible for the position. In fact, Mather was told that he would be placed on the approved candidate list as a result of his score on the exam. Batko, the man only serving in the position on a "provisional" basis was selected to fill the TPE position.
 *** 60. On or about March 15, 1995, the Engineering Administrator at the time, Earle Munroe, informed the Office of Personnel in a memorandum that a PE license would be required for three TPE positions within the Office of Engineering: the two positions where it was historically applied, Soils and Foundations and State Forces; Bridge Design and, as a new requirement, the Hydraulics and Drainage TPE position.
 61. Munroe's memorandum (written by Obara) established his practice on this issue, but that did not bind his successor. . . . Coughlin understood that he had the discretion to change the practice, in consultation with the Chief Engineer, and that the practice would continue unless he took action to change it.
 *** 64. [While the issue has come up repeatedly], [t]here has been no serious consideration of eliminating the PE license requirement.
65. Mather first applied to take the PE examination in November 1991. CT Page 10709
 66. Mather then sat for, and failed, both sections of the PE examination in October 1993 and October 1994. [He also failed in April 1995, October 1997, October 1998 and April 1999 and did not have the license at the time of the hearing before the commission].
 67. On or about November 10, 1994, [Mather] wrote to the [department's] Personnel Office, complaining about . . . the application of the PE license requirement [to TPEs].
 68. On or about December 5, 1994, Michelle Pancallo, of Personnel . . . informed Mather that the PE license "traditionally" had been imposed in the Bridge Design, Soils and Foundations, and Hydraulics and Drainage Units. . . .
 *** 70. Shortly after [this] letter was issued, the [department] appointed . . . a white male, as a TPE in Hydraulics and Drainage [who] . . . did not have a Connecticut PE license. [Again, in 1997, another white male without a PE license was temporarily appointed a TPE in Hydraulics].
 *** 92. In the summer of 1997, Batko announced that he was planning to retire from his position as TPE in the Soils and Foundations Unit. . . . Obara advised [Mather, Gonzales and Fontaine] that Batko was retiring, and that he was going to appoint the replacement TPE on a [temporary] basis. . . . [Obara] did not make any mention of a PE license requirement at that time. . . . Obara knew at this first meeting that neither Mather nor Gonzalez had a PE license. . . . Fontaine had a PE license.
 *** 94. Prior to Obara's decision on the [temporary] appointment, there were internal discussions as to whether or not to apply the PE license requirement to the TPE positions in the Soils and Foundation Unit as well as the Hydraulics and Drainage Unit. . . . A decision had not yet been made on the application of the PE license.
95. In the summer of 1997, Mather [was informed by] Monroe . . . CT Page 10710 that a PE license would be required for the position, because he knew Mather "did not have the PE and I wanted him to try and get his PE."
 *** 97. On August 27, 1997 . . . Byrnes told Mather that the TPE Soils position would require a PE license.
 98. As reflected in Byrnes' contemporaneous notes of the meeting, Mather told Byrnes that Mather thought the PE was a legitimate requirement for the position, and simply wanted six months to obtain the license. . . . Byrnes declined Mather's request to replace Fontaine with Mather for the temporary . . . position, and waive the PE requirement.
 *** 102. According to Obara, a meeting was held in mid-August 1997. The purpose of the meeting was to discuss the PE license issue. Although Obara could not remember who called the meeting, or who attended the meeting, he recalled that every division within the Office of Engineering was represented. . . .
 103. According to Obara, a decision was made at the meeting to maintain the status quo as described in the memorandum he authored in 1995 for Earl Munroe's signature. . . .
 104. According to Obara, he did not recommend that the Hydraulics and Drainage license requirement be adjusted and the group decided to apply the PE license requirement to Hydraulics and Drainage.
 105. At the final meeting with the three TSEs in the Soils and Foundations Unit, Obara asked Mather and Gonzalez their intentions with respect to obtaining their PE licenses. . . . Mather indicated that he intended to pursue a PE license. . . .
 ***
108. In late August 1997, Obara . . . promoted Fontaine on a [provisional] basis. . . . Obara explained that he had applied the PE license as a mandatory requirement, which meant that Fontaine was the only eligible candidate. CT Page 10711
 *** 117. After the [provisional] appointments had been made, discussions continued to be held within the [department] as to whether the PE license requirement should be applied to either the Hydraulics and Drainage or Soils and Foundations TPE positions.
 118. In November 1997, the [department] issued a job posting for the four "permanent" TPE positions in the Design Services Division, including the Soils and Foundations position sought by Mather. . . .
 119. The job posting explicitly made the PE license a prerequisite to the position in Soils and Foundations. . . . This was the first notice ever issued to employees announcing that a PE license would be required [although there was a proposed position, "Transportation Engineer of Soils and Foundations," that was never created which had a mandatory PE license requirement].
 120. None of the other job postings for the permanent TPE positions in Design Services [including] Hydraulics and Drainage . . . included a PE license [but subsequently in July 1998, the PE license requirement was applied as the appointment to the permanent position was made].
 121. Obara advised both Mather and Gonzalez that they could apply and be interviewed for the permanent appointment to the Soils and Foundations position, but the successful candidate would still have to have the PE license at the time of appointment.
 *** 123. Only half of the six applicants for the vacant TPE Soils and Foundations position had PE licenses. . . . The panel deliberately evaluated the candidates without consideration of who did or did not have a PE license.
 124. The interview panel did not exclude any applicants and all six applicants were interviewed for the TPE Soils position.
125. After consulting with the staff of the [department's] affirmative action office Mather applied for the position CT Page 10712 even though he did not have a PE license.
 126. In December 1997, Obara coordinated and conducted interviews for the permanent Soils and Foundations position. Obara selected the interviewers and personally structured the interview process. . . . Only Obara asked any questions during the interview. . . . The other interviewers . . . were silent throughout. The panel selected Fontaine over Mather, who came in second. . . . [Mather was found deficient in technical skills, supervisory skills, and oral communication.]
 *** 128. Each applicant for the four vacant TPE positions in the Design Services Division was asked the same set list of questions. . . . Because some applicants applied for more than one position, they were provided one interview for up to four positions.
 129. The interview questions included ones of general applicability, such as background and [department] policy, and then specific questions for the four separate TPE positions in Design Services.
 *** 134. Each interviewer independently evaluated the applications, and individually ranked the applicants [using his own rating scale.]
 *** 137. Immediately before the interview began, Obara instructed Mather that, because he was being interviewed for four positions, he should keep all of his answers short. . . . Mather did so. . . . None of the interviewees or interviewers corroborated Obara's claim that he instructed the other applicants similarly.
138. Much of the early portion of Mather's interview, about 15-20 minutes, was taken up by a discussion of Mather's resume, including his engineering and educational experience in England, in Sri Lanka and at the [department]. . . . Obara prepared ahead of time for the discussion of Mather's prior career, making detailed notes on two separate occasions . . . CT Page 10713 He did not prepare, make notes or conduct such a background review for any other applicant.
 *** 148. In early January 1998, following completion of the interviews, Obara promptly announced his selection of Fontaine as the permanent appointment for TPE in the Soils and Foundations Unit. . . .
 149. Mather was surprised as to the sudden announcement, and asked Obara whether he had followed the proper procedures of review by the Affirmative Action and Personnel Departments. . . . The next day, Obara issued a memorandum indicating that the final decision as to the permanent appointment for the TPE in Soils and Foundations would be announced later. Nine months later, in September 1998, Fontaine was appointed to the permanent position of TPE.
 *** 153. [In June 1998], Obara was asked [by the department affirmative action office] specifically "whether or not the PE license requirement should be imposed for Soils as well as for Hydraulics and Drainage." [To be consistent, Obara agreed to maintain the requirement of the PE license for the Soils and Foundation TPE position but changed his mind, requiring the PE license for the TPE in Hydraulics and Drainage.]
(Footnotes omitted.) (Return of Record ("ROR"), Volume 1, Item 1, pp. 4-29.)
Based on these finding of fact, the human rights referee concluded that the plaintiff had set forth a prima facie case of discrimination and rejected the two nondiscriminatory reasons proffered by the department as pretextual. The human rights referee found that the requirement of the PE license was used discriminatorily against Mather and that the interview for the TPE position had been "stacked against" him from the outset. (ROR, Volume 1, Item 1, pp. 39-41.) The human rights referee found unlawful discrimination and awarded relief. (ROR, Volume 1, Item 1, pp. 45-49.) This appeal followed.[2]
The court first notes the limited scope of review afforded under the UAPA in reviewing administrative agency determinations. "Judicial review CT Page 10714 of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . The substantial evidence standard is satisfied if the record provides a substantial basis of fact from which the fact in issue can be reasonably inferred. . . ." (Citations omitted; internal quotation marks omitted.) Adriani v.Commission on Human Rights Opportunities, 220 Conn. 307, 314-15
(1991). The trial court may not "retry the case or substitute its own judgment for that of the [administrative agency]. . . . The conclusion reached by the [administrative agency] must be upheld if it is legally supported by the evidence. . . . The credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency, and, if there is evidence . . . which reasonably supports the decision of the [agency], [the court] cannot disturb the conclusion reach by [it]. . . . Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Citations omitted; internal quotation marks omitted.)Domestic Violence Services of Greater New Haven, Inc. v. FOIC,47 Conn. App. 466, 470 (1998).
Questions of law reached by administrative agency must stand "if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts. . . ." (Citations omitted; internal quotation marks omitted.)MacDermid, Inc. v. Dept. of Environmental Protection, 257 Conn. 128, 137
(2001).
Turning to the merits of the appeal, the parties agree with the human rights referee that: "The traditional allocation of proof for discrimination cases[3] was first articulated by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792,93 S.Ct. 1817 (1973). . . . The typical requirements in the burden-shifting analysis . . . are as follows: (1) if the complainant establishes a prima facie case of discrimination, (2) the employer must articulate, but not prove, a legitimate, non-discriminatory reason for its actions and (3) the complainant must then prove that the employer's reason is in fact a pretext for discrimination. . . . The burden of persuasion remains at all times with the complainant. The Connecticut Supreme Court has adopted this burden of proof and production for cases under the Connecticut Fair Employment Practices Act ("CFEPA"). See Levy v. Commission on HumanRights and Opportunities, 236 Conn. 96, 107-08 (1996)." (ROR, Volume 1, Item 1, p. 31.)
Nor do the parties disagree over the following statement by the human CT Page 10715 rights referee as to the elements of a prima facie case: "Under this basic scheme, a complainant must establish that (1) he belongs to a protected class; (2) he was qualified for the position; (3) that, despite his qualifications, he applied for a position, and was not selected; and (4) the position remained open and the employer continued to seek other applicants, or it was filled by an individual not of the complainant's protected class(es)." (ROR, Volume 1, Item 1, p. 33.)
In the present appeal, the department maintains that the human rights referee erred in finding that Mather met his initial burden of establishing a prima facie case of discrimination. According to the department, Mather had not established that he was "qualified" for the position of TPE in Soils and Foundations since he lacked a PE license when the decision on promotion was made. The department relies on York v.American Telephone Telegraph Co., 95 F.3d 948 (10th Cir. 1996), where the court held that a prima facie case of discrimination in promotion required the plaintiff to prove that she "qualified for the position of Operating Engineer," and not merely that she "possessed the minimal qualifications that the jury deemed necessary for safe and effective job performance." Id., 954. "As long as the qualifications offered by the employer are reasonable and have been consistently applied to all applicants for the position, as was the case here, there is no reason for the fact finder to supplant the employer's list of qualifications with its own." Id.; see also Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 (2d Cir. 2000).[4]
These cases do not address, however, the situation where the complainant tentatively proves that a qualification the employer seeks to impose has been discriminatorily applied. This is an issue that should be left for the "pretext" stage. Thus, in Cline v. Catholic Diocese ofToledo, 206 F.3d 651 (6th Cir. 2000), the plaintiff brought a Title VII claim based on her dismissal from a teaching position at a Catholic school. The district court found that the plaintiff was not qualified for her position because she had become pregnant in advance of her marriage in violation of a "moral failings" clause in her contract. The Sixth Circuit reversed the district court. The prima facie case requirement is not onerous, the Diocese had raised the issue of morality as its nondiscriminatory reason, and it was more appropriate to resolve this issue when discussing the plaintiff's proof of pretext. Id., 660. "InCline we cautioned that district courts must not use the "qualified' element of the prima facie case to heighten the plaintiff's initial burden." Peters v. Lincoln Electric Co., 285 F.3d 456, 473 (6th Cir. 2002).
As the Second Circuit has recently stated: "The qualification prong must not, however, be interpreted in such a way as to shift onto the CT Page 10716 plaintiff an obligation to anticipate and disprove, in his prima facie
case, the employer's proffer of a legitimate, non-discriminatory basis for its decision. As we have repeatedly held, the qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal; plaintiff must show only that he `possesses the basic skills necessary for performance of [the] job.'" (Citations omitted.)Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 92 (2d Cir. 2001); Byrnie v. Cromwell Board of Education, 243 F.3d 93 (2d Cir. 2001), cert. denied, ___ U.S. ___, 122 S.Ct. 348, 151 L.Ed.2d 263 (2001) (finding a prima facie case). Thus, the court agrees with the referee that "[t]his dispute [over the license requirement] . . . is exactly the crux of the matter. Contrary to the cases cited by the [department], [Mather] argues that the PE license requirement itself is applied inconsistently as a job requirement impermissibly based on applicants' races or national origins. [He] argues an objective review of his educational and work history as provided in his resume and personnel evaluations reveals that he has the requisite amount of supervisory and technical experience to warrant consideration for the position of TPE, the PE license notwithstanding." (ROR, Volume 1, Item 1, pp. 33-34.) "Based on this analysis, I find that [Mather] met his burden of proving a prima facie case of discrimination." (ROR, Volume 1, Item 1, p. 34.)
The parties do not question that, if Mather presented a prima facie case, then the department must set forth a nondiscriminatory reason for not promoting Mather. Further, the parties agree with the human rights referee's conclusion that the department has set forth two nondiscriminatory reasons: 1. Mather did not have a PE license and 2. he was not selected for the promotion after an interview process. (ROR, Volume 1, Item 1, p. 33.) The remaining issue raised by the department is whether the referee correctly concluded that theses reasons advanced by the department were pretextual. Mather had to prove that the reasons given were "unworthy of credence." Reeves v. Sanderson PlumbingProducts, Inc., 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105
(2000); McDonnell Douglas Corp. v. Green, supra, 411 U.S. 805; AnnHoward's Apricots Restaurant, Inc. v. CHRO, 237 Conn. 209, 226 (1996).
"A court is to examine the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff. . . ." (Citations omitted; internal quotation marks omitted.)Byrnie v. Cromwell Board of Education, supra, 243 F.3d 102. "Proof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. A combination of factors, any of which judged on their own would be much less compelling, provide sufficient evidence to allow a reasonable [trier of fact] to conclude CT Page 10717 that [the defendant's] explanation for failing to hire [the plaintiff] was a pretext for impermissible discrimination." (Citations omitted; parenthetical omitted.) Id.
The department's appeal thus turns on whether the referee's conclusions, drawn from her factual findings, are reasonable. The referee concluded that the asserted requirement of the PE license amounted to pretext — the requirement was applied "in a way that had a discriminatory impact on [Mather]." (ROR, Volume 1, Item 1, p. 37.) The court cannot conclude, however, that the referee's findings of fact reasonably support this conclusion.
Looking to the findings of fact, numbers 22 and 24 indicate that prior to the establishment of the TPE position, persons holding equivalent positions to the TPE had a PE license in the Soils and Foundations Unit. With the creation of the TPE position, the department was authorized to impose the PE license requirement in its discretion. (ROR, Volume 1, Item 1, p. 12 ¶ 53.) In 1995, Munroe wrote that the license should be imposed on both the Soils and Foundations and Hydraulics Units. The imposition on Hydraulics was a new requirement. (ROR, Volume 1, Item 1, p. 13 ¶ 60.) There has been no serious consideration to eliminating this requirement for the Soils and Foundations Unit TPE. (ROR, Volume 1, Item 1, p. 14 ¶ 64.) In 1994, department personnel informed Mather that the PE license had been traditionally imposed on both the Soils and Foundations and Hydraulics. (ROR, Volume 1, Item 1, p. 14 ¶ 68.) In 1994 and 1997, appointees to the Hydraulics TPE did not have a PE license. (ROR, Volume 1, Item 1, p. 14 ¶ 70; p. 21 ¶ 109.)
The requirement of the PE license on TPE's was discussed in the summer of 1997, without a final decision being made. (ROR, Volume 1, Item 1, p. 18 ¶ 94.) At this time, Mather had separate discussions with Munroe and Byrnes was told that the PE license was a legitimate requirement for the position. (ROR, Volume 1, Item 1, p. 18 ¶ 94, p. 19 ¶¶ 97, 98.) A meeting was held in mid-August 1997 with every division of the Office of Engineering represented. There was a tentative decision to keep the status quo in place. (ROR, Volume 1, Item 1, pp. 19-20 ¶¶ 102-04.) The job posting explicitly made the PE license a prerequisite to the position in Soils and Foundations. (ROR, Volume 1, Item 1, p. 23 ¶ 119.)
After the interviews were conducted, Obara met with the head of personnel and the staff of the Affirmative Action Office to discuss how to handle the TPE promotions. At that time, Obara was told by the personnel director to apply the PE license provision to both Soils as well as Hydraulics and Drainage. Thereupon, the highest ranking candidate in Hydraulics and Drainage was not selected because he did not have a PE CT Page 10718 license and the interview panel's second choice was selected for the permanent position of TPE in Hydraulics and Drainage. (ROR, Volume 1, Item 1, pp. 28-29 ¶¶ 152-55.)
These findings indicate that the department's requirement of a PE license for the TPE Soils and Foundations position has never changed — it has always been a prerequisite for the position. The Federal District Court in considering a Title VII suit by another department employee concluded similarly: "[T]he defendants have documented that for over thirty years, the DOT had required the person supervising the Soils and Foundations Unit to have and maintain a P.E. License." Gonzalez v.Connecticut, 151 F. Sup.2d 174, 181 (D.Conn. 2001). At most, the findings by the human rights referee show that the department continued to consider what to do about the PE license requirement in Soils and Foundations when imposing the requirement on Hydraulics and Drainage. This debate lasted after the interviews for the permanent positions had taken place. In the end, the PE license requirement was imposed on both units.
Under these circumstances, the court cannot concur in the referee's conclusion that the PE license requirement for the Soils and Foundations Unit was applied in an inconsistent or discriminatory manner or was given by the department as a false reason for the decision not to appoint Mather. Therefore, the court does not find one of the reasons set forth by the department — Mather's lack of a PE license — pretextual.
The human rights referee also concluded that the department's second nondiscriminatory reason — that another candidate was found more qualified by an interview panel — was pretextual. The human rights referee pointed to at least six flaws in the interview process[5]: (1.) Prior to the interviews, Obara, who was responsible for designing the interview process, prepared specific questions to be asked of Mather; he did not prepare questions for any other applicant; (2.) The first fifteen to twenty minutes of Mather's interview was spent reviewing his resume, including his foreign education and work experience; (3.) Mather had worked for Obara for several years and there was no need for Obara, who asked all the questions at the interview, to spend an extensive period of time on Mather's resume; (4.) Mather was the only candidate told to keep his answers short; (5.) The panel only mentions oral skills in its appraisal of Mather, a foreign-born applicant; and, (6.) In January 1998, Obara announced the decision of the panel, and the appointment of Fontaine, but had to retract his announcement when it developed there were further steps to be taken.
The department contests the human rights referee's assertions by CT Page 10719 stating that Obara was only one of three persons scoring the interviews and agreeing on the result; Mather was marked down, not for short answers, but because some of the answers he gave were wrong; another foreign-born applicant also tested poorly on some of the questions, and this did not derive from his "accent;" and, Obara made an error in immediately appointing Fontaine in January, but this was because he did not know of a new department policy. In other words, Obara should not be "vilified" (Department's Brief, p. 51) for doing an efficient job. This court, however, may not overturn the human rights referee's finding of pretext if there is substantial evidence to support the findings of fact, and the conclusions drawn therefrom are reasonable. Adriani v. CHRO, supra, 220 Conn. 314-15.
In Hasham v. California State Board of Equalization, 200 F.3d 1035
(7th Cir. 2000), the plaintiff, a Pakistani, claimed a violation of Title VII for a failure of a state agency to promote him. As in this case, the plaintiff alleged that the nondiscriminatory reason given for failure to promote — the results of a written and oral examination — was pretextual. The jury found for the plaintiff, after the defendant's area administrator testified about the oral examination process. The appellate court upheld the jury verdict: "Being particularly careful in employment discrimination cases to avoid supplanting our view of the credibility or weight of the evidence for that of both the jury (in its verdict) and the judge (in not interfering with the verdict) . . . we hold that [the agency] was not entitled to judgment as a matter of law because, when viewing the evidence in the light most favorable to the plaintiff as we must, we conclude that a rational jury could have found that [the agency] intentionally discriminated against Hasham on the basis of his national origin. . . ." (Citations omitted; internal quotation marks omitted). Id., 1047-48.
In this case, there is substantial evidence to support the referee's findings leading to the conclusion of pretext. See ROR, Volume 17, Item 114, p. 2770; Volume 18, Item 113, p. 2686; Volume 6, Item 125, p. 5392 (Obara's role in designing and conducting the examination); Volume 18, Item 113, pp. 2696-97; Volume 21, Item 110, pp. 1845-46, 1907; Volume 27, Item 172, Exhibit R-20, p. 5929 (Obara made up questions in advance only for Mather); Volume 6, Item 125, p. 5392; Volume 9, Item 122, p. 4730; Volume 21, Item 110, p. 1845 (length of Mather's interview devoted to discussing resume and foreign education and training); Volume 6, Item 125, p. 5393 (Obara and Mather had worked together for many years); Volume 6, Item 125, p. 5389; Volume 9, Item 122, p. 4735; Volume 19, Item 112, p. 2284 (Obara told Mather to keep answers short); Volume 17, Item 114, p. 2763; Volume 21, Item 110, p. 1926; Volume 26, Item 149, Exhibit C-53, p. 5616 (emphasis on Mather's oral skills); Volume 9, Item 122, p. 4735; Volume 18, Item 113, p. 2660 (Obara first announced chosen CT Page 10720 candidate and then reversed himself).)
To conclude, the court agrees with the referee's finding that one nondiscriminatory reason offered by the department is pretexual, but disagrees with the finding that the other reason offered is pretextual. Under these circumstances, the court must question whether the prima facie case of discrimination combined with the legitimate finding of pretext in this case is enough to sustain the referee's finding of intentional discrimination. The finding of pretext "is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." "This is not to say that such a showing by the plaintiff will always be adequate to sustain a . . . finding of liability." (Emphasis in original.) Reeves v. Sanderson PlumbingProducts, Inc., supra, 530 U.S. 147-48; Craine v. Trinity College,259 Conn. 625, 645 (2002) (applying Reeves to a suit under General Statutes § 46a-60 et seq., the Connecticut Fair Employment Practices Act).
Reeves also points out that, in some circumstances even with proof of pretext, "no rational factfinder could conclude that the action was discriminatory [where] . . . the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." Id., 148. On the other hand, where there is both a pretextual reason and a non-pretextual reason, these reasons may be "so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could [prevail]." Russell v. Acme-Evans Co., 51 F.3d 64, 70 (7th Cir. 1995);Wilson v. AM General Corp., 167 F.3d 1114, 1120 (7th Cir. 1999).
The human rights referee must reconsider Mather's case to determine whether Mather's prima facie case, taken with the finding of pretext that the court has approved, is sufficient to find intentional discrimination by the department. The human rights referee must also consider whether the requirement of a PE license, the legitimate reason advanced by the department, was independent or intertwined with the pretextual reason, the interview process.[6]
The court therefore sustains the appeal and remands it to the human rights referee for a new decision based upon the standards set forth in this opinion and the facts of record. Dufraine v. CHRO, 236 Conn. 250,265 (1996).[7]
______________________ Henry S. Cohn, Judge CT Page 10721